In the Matter of the ESTATE OF Gilbert OSTBY, Deceased.

**Dean OSTBY, Personal Representative of the Estate of Gilbert Ostby, Deceased, Respondent and Appellant,**

v.

**Sena BISEK, Petitioner and Appellee.**

Civ. No. 910073.

Supreme Court of North Dakota.

Feb. 4, 1992.

Bruce H. Carlson (argued), and David J. Hauff of McNair, Larson & Carlson, Ltd., Fargo, for respondent and appellant.

Steven K. Aakre (argued), and Armond G. Erickson of Serkland, Lundberg Erickson, Marcil & McLean, Ltd., Fargo, for petitioner and appellee.

MESCHKE, Justice.

Dean Ostby appeals from denial of his post-trial motions and from a judgment declaring that the will filed for the decedent, Gilbert Ostby, was not his will. Dean argues that the trial court did not apply the correct law, that the evidence did not disprove testamentary intent, and that the trial court made erroneous findings of undue influence. We agree. We reverse and remand for a new trial.

Gilbert, a bachelor who lived alone, was hospitalized in Breckenridge on June 13, 1989, with arthritis, prostate discomfort, and coronary artery insufficiency. Early on June 16th, Gilbert again had visited with Glen Ostby about making his will. Glen, a will beneficiary, had declined once before to help Gilbert get a will prepared because of his own poor health. Later that day, Gilbert was transferred from the hospital to a nursing home in Wahpeton.

At the nursing home, Dean visited Gilbert in the late afternoon on Friday, June 16. According to Dean, Gilbert then asked Dean to help arrange an auction sale and to help get a power of attorney and a will prepared for him. Gilbert told Dean what he wanted in a will, and Dean wrote Gilbert's ideas on a piece of discarded cardboard:

Beulah and Betty and Glen will divide the checking acconts [sic] 1 in Hankinson Bank and 1 in Rosholt Bank after all expenses are paid

Dean will get the Homested [sic] and Glen will get the two 80's the Roof 80 and the East 80

Have auction sale as soon as possible on Personal Property

Dad and Sena will not share in the Estate.

Gilbert asked Dean to have attorney Richard Healy at Hankinson prepare the documents.

Dean was unable to reach Healy over the weekend, but on Monday, June 19, Dean took the notes to Healy. Healy had never met Dean before, but knew Gilbert from prior legal work for him. In a few hours, from the notes supplied by Dean, Healy prepared a proposed will and the power of attorney for Gilbert.

Later that same day, Dean obtained a copy of the prepared documents from Healy's office, went to the nursing home, and read the dispositive clauses of the will to Gilbert. After each clause was read, Dean asked Gilbert if that was alright. Gilbert indicated his approval to each clause read to him by responding "okay." Dean read the residuary clause, not covered by the notes but added by Healy, and explained why it was added. This clause divided the residue equally among the same four nieces and nephews that Gilbert designated for specific gifts in his will. Gilbert replied that this clause too was "okay."

Near the dinner hour on June 19, acting upon a telephoned request from Healy's office, Dr. Wasemiller, Gilbert's treating physician, saw Gilbert at the nursing home to assess his testamentary capacity. Following this visit, Dr. Wasemiller dictated a letter to Healy that was received by Healy after Gilbert's death. Dr. Wasemiller wrote that he found Gilbert "well oriented to time, place, and circumstances. He conversed coherently and rationally. It is my impression that the patient is mentally competent in a testamentary capacity."

After Dean read the dispositive clauses of the will to Gilbert who indicated his approval, Dean called Healy who was dining with his wife at a local restaurant in Wahpeton. Healy and his wife, Donna, went to the nursing home after dinner and met privately with Gilbert to help him complete the documents. Healy recognized Gilbert, although Donna had not met him before. Because Dean had essentially read the will to Gilbert, Healy testified that he did not review the will further with Gilbert before it was signed.

Healy asked Gilbert if he wished to sign the will. Gilbert nodded his head to confirm his desire to do so. Gilbert appeared "alert," "attentive," "focused," and "ready" to sign the will, according to Healy, although both Healy and Donna said that Gilbert spoke very little while they were in his room. Both Healys testified that Gilbert was uncomfortable, and that he needed an interruption for nursing attention while they were there. Propped on an elbow, Gilbert shakily signed the will and the power of attorney, Healys witnessed and notarized the documents, and left with the completed documents. During the next day, Gilbert was returned to the hospital. Early on June 21, 1989, Gilbert died of congestive heart failure.

Gilbert's will appoints Dean as personal representative and divides Gilbert's property among four of his nieces and nephews, including Dean, who are children of a deceased brother and of his surviving brother, Peter Ostby. The will leaves nothing to Gilbert's surviving sister, Sena Bisek. According to Glen and Dean, Gilbert told them that he'd given Sena money for her needs and that her daughter was adopted so that her descendants were not "of his family." If the will is invalidated, Peter Ostby and Sena Bisek receive the majority of the estate by intestate succession, while Dean, as Peter's son, will receive nothing. See NDCC 30.1–04–03 (UPC 2–103). When

the will was filed for informal probate, Sena Bisek objected to it, alleging lack of testamentary capacity and undue influence by Dean Ostby.

After trial, the trial court ruled that the will "is not in fact the last will and testament of Gilbert Ostby" because Gilbert "did not know what he was signing" and "did not know the contents," and because the will was "a result of undue influence of Dean." Soon after the judgment, the trial judge, Honorable Bayard Lewis, retired. Dean moved to amend the findings, to vacate the judgment, and for entry of a judgment admitting the will to probate. Dean's post-trial motions were denied by the successor judge, Honorable Hal Stutsman. Dean Ostby appeals.

If a trial judge is unable to act on post-trial motions because of death, disability or other cause, a successor judge may act. NDRCivP 63. Still, the power of a successor judge to review evidence of disputed facts is circumscribed. *Paulson v. Meinke*, 352 N.W.2d 191 (N.D.1984). If the successor judge "is not satisfied with the findings, conclusions and decree of his predecessor, and thinks [they] should be vacated or modified, but cannot do so because he did not see and hear the witnesses, then he is limited to the granting of a new trial." *Paulson* at 193, quoting an Idaho decision. In this case, the successor trial judge denied the post-trial motions.

On appeal, we review the findings of the trial court, not the reasoning of the successor judge. NDRCivP 52(a). We set aside findings of fact only when they are clearly erroneous. *National Bank v. International Harvester Co.*, 421 N.W.2d 799 (N.D.1988). As NDRCivP 52(a) directs, we defer to the opportunity of the trial court to judge the credibility of witnesses. Still, findings induced by an erroneous view of the applicable law are clearly erroneous. *Hom v. State*, 459 N.W.2d 823 (N.D.1990). In this case, we conclude that the trial court made its findings with an erroneous view of the law of testamentary intent and of undue influence.

Dean argues that the trial court did not apply the correct law, that the evidence did not disprove testamentary intent, and that the trial court made erroneous findings of undue influence. We agree.

Sena argues that the trial court's finding, that Gilbert "did not know" the document was a will, suffices because the trial court "recited many significant portions of the evidence," including particularly this one:

> [F]rom the twelve short lines on the [cardboard], a six page legal document was drawn which contained language which would be difficult for a layman to understand, much less to explain to another layman.

Sena argues that "[t]here is insufficient evidence that [Gilbert] knew what was in the documents he signed on June 19," because "lack of communication between attorney and client, Gilbert's dire medical condition, and the incomplete and hasty review of the will all combine to rebut any presumption of due execution." However, we conclude that the trial court's findings, based upon an erroneous view of the law, are clearly erroneous.

█ A proponent of a will must only prove its due execution to show testamentary intent. NDCC 30.1–15–07 (UPC3–407). A contestant of a will must prove lack of testamentary intent, lack of testamentary capacity, undue influence, or any other frailty in a duly executed will. *Id.* If a will is self-proved, compliance with signature requirements is conclusively presumed, and other requirements of execution are presumed, subject to rebuttal, unless the acknowledgement is forged or fraudulent. NDCC 30.1–15–06. Thus, upon proof of due execution, testamentary intent is presumed, placing the burden to disprove it upon the contestant. *In re Papineau*, 396 N.W.2d 735 (N.D.1986). In this case, Sena, as the contestant, had the burden of proof.

█ Knowledge of the contents of a document executed as a will is a matter of testamentary intent. 79 Am.Jur.2d *Wills* § 19 (1975); 1 Bowe–Parker: Page on Wills, § 5.8 (3d ed. 1960). North Dakota law thus places the burden of proving a lack of testamentary intent, or the lack of

knowledge of the contents of a duly executed will, on the contestant. The trial court's findings show a lack of awareness of that burden on the contestant here.

The trial court made no finding that Gilbert lacked testamentary capacity. And, it is difficult to imagine how testamentary capacity could be lacking in this case. While Gilbert was physically weak and uncomfortable, there is little or nothing to show that his mental competency was questionable. Dr. Wasemiller, who made a special visit to the nursing home to evaluate Gilbert's condition just before he signed the will, concluded that Gilbert was "well oriented," "conversed coherently and rationally," and was "mentally competent." Even Sena, who had seen Gilbert on the day that he gave Dean directions for the will, acknowledged that Gilbert was "sharp," and that there was "nothing wrong with his mind," though he wasn't "his old self." Neither lay nor expert testimony evidenced a lack of mental capacity by Gilbert on the day that he signed the will. Therefore, the trial court's findings that Gilbert did not know the contents of his will bear only on Gilbert's testamentary intent, not on his testamentary capacity.

The trial court's findings, and Sena's arguments, about Gilbert's lack of knowledge of the contents of his will turn on Dean's testimony that he read to Gilbert only the "dispositive" clauses of the will, and not other technical clauses, and that a residuary clause was added by the attorney although not included in Gilbert's prior instructions. Dean testified that he read these titled sections of the will to Gilbert: (1) RECITAL OF FAMILY BACKGROUND AND IDENTIFYING HEIRS; (2) NOMINATION OF ESTATE PERSONAL REPRESENTATIVE AND SUBSTITUTE; (4) PAYMENT OF ALL EXPENSES, DEBTS, TAXES FROM ESTATE BEFORE DISTRIBUTION OF ESTATE; (7) SEPARATE WRITING IDENTIFYING BEQUESTS OF TANGIBLE PERSONAL PROPERTY; (10) DISTRIBUTION OF CHECKING ACCOUNT DEPOSITS, SUBJECT TO PAYMENT OF ALL ESTATE DEBTS, ADMINISTRATION EXPENSES, INCOME AND ESTATE TAXES; (12) DISTRIBUTION OF LANDS; and (13) DISTRIBUTION OF REST AND RESIDUE OF ESTATE.

As to each, Gilbert replied "okay," including the last clause distributing the residue to the same four beneficiaries named as devisees of specific gifts.

■ Dean did not read technical clauses to Gilbert that were entitled as follows: (3) BROAD POWERS OF PERSONAL REPRESENTATIVE; (5) SIMULTANEOUS OR COMMON DISASTER DEATH; (6) BENEFICIARY UNDER WILL WHO OBJECTS TO PROBATE OR ATTACKS OR CONTESTS WILL NOT TO TAKE—NO CONTEST CLAUSE; (8) PERSONAL REPRESENTATIVE—NO CONFLICT OF INTEREST; (9) PERSONAL REPRESENTATIVE ADDITIONAL POWERS; and (11) DISTRIBUTION PER STIRPES AND NOT PER CAPITA.

These latter clauses are more important to a legal practitioner than to a disposing testator. Gilbert signified to Healy that he wanted to complete the will that was specifically prepared for him by Healy. That is all that is necessary. A physically infirm, though mentally competent, testator is entitled to the help of his lawyer and his family in preparing and publishing the will that expresses his testamentary wishes, whether he comprehends every clause in it or not.

■ It is not essential that a testator understand the meaning of the technical clauses of a will, if the instrument is intended as a will and if it expresses the testator's intent to distribute his property at death. 79 Am.Jur.2d *Wills* § 19 (1975). If a duly executed will contains the decedent's general instructions for its contents, testamentary intent exists. 1 Bowe–Parker: Page on Wills § 5.8. Direct evidence that the decedent fully read and understood all of the provisions of the will is unnecessary. *Id.*

■ The trial court, early in the trial during Healy's testimony for the proponent, refused to admit this duly executed

will into evidence because "Mr. Healy ... did not explain the document to him. There's nothing in the evidence to show that there is, in fact, the will of Gilbert Ostby." By so ruling, the trial court effectively placed the burden of proving testamentary intent upon the proponent of the will, rather than the lack of it on the contestant. Later, the court admitted the will in evidence over the contestant's objection that "[t]here is no new evidence as to whether Gilbert Ostby saw the—had a chance to read the entire document." At that point, while making the executed will an exhibit, the trial court said, "it's more a matter of credibility than admissibility." The trial court's grudging evidentiary rulings show that it mistakenly placed the burden of persuasion on the proponent of the will to show testamentary intent.

 Moreover, the trial court's finding, that testamentary intent is lacking, was based on an equally erroneous view of the law. Unless a duly executed will is ambiguous, the testamentary intent is derived from the will itself, not from extrinsic evidence. *Montague v. Street*, 59 N.D. 618, 231 N.W. 728 (1930); *Erickson v. Ward*, 351 N.W.2d 445 (N.D.1984); *Jordan v. Anderson*, 421 N.W.2d 816 (N.D.1988); NDCC 30.1–09–03 (UPC 2–603) ("The intention of a testator as expressed in his will controls the legal effect of his dispositions"). It is immaterial whether Gilbert had the technical clauses of his will explained or "read" to him by his attorney, if he intended the will prepared by his attorney to be his testamentary disposition. Once due execution was proven, the executed will *is* the decedent's testamentary intent. Then, unless there is clear fraud or mistake, extrinsic evidence is not admissible to dispute it, only to interpret it.

If the trial court meant, by finding that Gilbert "did not know what he was signing," to reinforce the additional finding that the will was obtained by undue influence of Dean, we conclude that this finding, too, was affected by a mistaken view of the law.

Sena justifies the trial court's additional finding of undue influence by Dean because "a presumption of undue influence has been found to exist where the influencer has a confidential relationship with the testator and is able to dictate the contents and control or influence the drafting of a will either as the draftsman or as one who procured the drafting." Citing *In Re Estate of Malnar*, 73 Wis.2d 192, 243 N.W.2d 435 (1976), also relied upon and quoted at length by the trial court, Sena argues that "Dean must overcome a presumption of undue influence" because "Dean had a confidential relationship with Gilbert, and easily dictated and drafted the purported will." These arguments by Sena on appeal suggest that the trial court misapplied North Dakota law.

 Undue influence is a question of fact. *Estate of Mickelson*, 477 N.W.2d 247 (N.D.1991). Undue influence must be proven by the contestant; mere suspicion is not enough. *Matter of Estate of Herr*, 460 N.W.2d 699 (N.D.1990). We have repeatedly rejected the notion that there is any presumption of undue influence arising from the existence of the decedent's power of attorney to a helpful beneficiary, or from a confidential relationship with the decedent of a helpful beneficiary. *Estate of Mickelson; Estate of Ambers*, 477 N.W.2d 218 (N.D.1991); *Estate of Polda*, 349 N.W.2d 11 (N.D.1984); *Estate of Wagner*, 265 N.W.2d 459 (N.D.1978). We do so again.

 In its opinion analyzing the law and facts in this case, the trial court discussed the Wisconsin opinion, *In Re Estate of Malnar*, 73 Wis.2d 192, 243 N.W.2d 435 (1976), at length. The trial court quoted this portion:

The basis for the undue influence presumption lies in the ease in which a confidant can dictate the contents, and control or influence the drafting, of a will either as the draftsman or as one who procures the drafting. Hamm, supra, 67 Wis.2d p. 294, 227 N.W.2d 34. We agree with the trial court that the opponent to the will introduced sufficient evidence to entitle him to the benefit of the presumption. Once the presumption was established, the burden of persuasion shifted to the

proponent, Genevieve Malnar, to introduce sufficient evidence to rebut the presumption. Genevieve had the burden of proving that the non-existence of the presumed fact (undue influence) was more probable than its existence. Sec. 903.01, Stats.

In attempting to satisfy her burden of persuasion, Genevieve Malnar introduced evidence indicating that testatrix was a strong-willed woman who was not susceptible to influence.

243 N.W.2d at 437. The trial court thus used a presumption foreign to North Dakota law to shift the burden of persuasion to Dean, as the proponent of the will, and thus to make the finding of undue influence in this case.

Judge Stutsman thought that Judge Lewis "also made reference to the correct law," particularly noting that Judge Lewis quoted the following from *Stormon v. Weiss*, 65 N.W.2d 475, 516 (N.D.1954):

The mere fact that a confidential or fiduciary relation existed with opportunity to exercise influence, does not establish undue influence.

We are not reassured. Sena continues to argue on this appeal that, "[u]nder the *Malnar* rationale, Dean must overcome a presumption of undue influence." This erroneous view of the law confirms to us that the trial court's finding of undue influence was misguided.

We conclude that the trial court found undue influence under an erroneous view of the law, and we therefore hold that the finding of undue influence is clearly erroneous. Because other findings indicate that the trial court had an erroneous view of the law of testamentary intent as well, a new trial is necessary.

Therefore, we reverse and remand for a new trial.

ERICKSTAD, C.J., and LEVINE and VANDE WALLE, JJ., concur.

Justice GIERKE, a member of the Court when this case was heard, resigned effective November 20, 1991, to accept appointment to the United States Court of Military Appeals and did not participate in this decision.

Supreme Court of North Dakota.

Feb. 4, 1992.